J-S58030-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: C.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.L., BIRTH MOTHER | No. 748 WDA 2014 |

Appeal from the Order April 9, 2014
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): TPR 208 of 2013

| | |
|---|---|
| IN RE: I.L.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.L., BIRTH MOTHER | No. 749 WDA 2014 |

Appeal from the Order April 9, 2014
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): TPR 204 of 2013

| | |
|---|---|
| IN RE: N.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.L., BIRTH MOTHER | No. 750 WDA 2014 |

Appeal from the Order April 9, 2014
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): TPR 207 of 2013

BEFORE: GANTMAN, P.J., BENDER, P.J.E., and PLATT*, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED SEPTEMBER 05, 2014**

K.L. (Mother) appeals from the orders that involuntarily terminated her

parental rights to I.L.L. (born in February of 2008), C.L. (born in March of

*Retired Senior Judge assigned to the Superior Court.

2009), and N.L. (born in September of 2010) (collectively Children) pursuant to 23 Pa.C.S. § 2511(a)(5), (8) and (b).[1] We affirm.

The family first became known to the Allegheny County Office of Children, Youth and Families (CYF) in 1999 "due to issues of substance abuse, mental health instability and domestic violence resulting in the removal and placement of two other children." Trial Court Opinion (T.C.O.), 6/17/14, at Exhibit A ¶ 3.[2] The three Children at issue in the present case were removed from their parents' care on September 4, 2012, and were adjudicated dependent on November 13, 2012. *Id.* at ¶ 4. The determination of dependency was based upon the court's finding inadequate care of the Children and the condition of the home. Specifically, the court noted:

> b. The investigating caseworker completed a Safety Assessment of the home. The caseworker found the home to be inappropriate due to exposed wiring, open electrical outlets, exposed ventilation holes in the walls, holes in the cabinetry, a broken screen door, and raised nails on the floor. Located in the children's sleeping space were cribs with lids constructed of cage doors, plastic safety ties, and tape.
>
> c. According to the intake caseworker, the children were observed chewing on phone cords which were plugged into the wall, climbing on the stove, eating Styrofoam, and spitting on to

---

[1] The parental rights of M.L., the Children's father (Father), were also involuntarily terminated. Father is not a party to the current appeal; nor has he filed a separate appeal.

[2] Mother's parental rights to these two other children were involuntarily terminated in August of 2004 and May of 2005.

the floor. Furthermore, during the visit, [I.L.L.] and [C. L.] were undressed wearing only pull ups. The report states mother did not redirect the children's behavior.

*Id.* at 5 b. and 5 c.

Mother entered into a Voluntary Placement Agreement, agreeing "to work with crisis in[-]home services, complete a POWER evaluation and follow recommendations, and attend an AFA interactional and individual assessment and locate housing [since Mother had been evicted from the home that she had shared with the Children]. *Id.* 5 d. Because Mother was not fulfilling the conditions of the Voluntary Placement Agreement, an emergency custody order was entered on October 4, 2012. Thus, legal custody was transferred to CYF and placement of the Children continued. The court provided a detailed placement history for the Children, indicating that since August 27, 2013, I.L.L. has been in placement with T.C., and that C.L. joined N.L. on December 22, 2013, at the home of J.D. and S.D. *Id.* at ¶ 7. It was noted by that court that I.L.L. and C.L "have special needs that require wrap-around services." *Id.* at ¶ 8.

The court also discussed the family service plan established for Mother, listing the numerous goals, the many services provided, and Mother's success or failure in reaching these goals. *Id.* at ¶¶ 9-17. Dr. Neil Rosenblum performed interactional evaluations of the Children with their respective foster parent/parents. He also performed this type of evaluation of the Children with Mother and an individual evaluation of Mother. The

court's decision contains an extensive recitation of Dr. Rosenblum's observations, assessments and recommendations. The court stated:

a. Mother repeatedly uses poor judgment due to a combination of emotional dependency and limited intellectual resources. She routinely allows people to take advantage of her. She also struggles in her ability to protect her [C]hildren from the very dysfunctional lifestyle to which they were exposed for many years. She is naïve, easily manipulated, but well intentioned.

b. During the interactional evaluation with [M]other, [I.L.L.] seemed to be pleased to greet his [M]other in the waiting room and gave her a hug. Although he was eager to enter the playroom, immediately he wanted to know whether T.I., his foster mother, could come in. He seemed to be disappointed when told no, and seems to have a growing emotional dependency on foster mother. [C.L.] and [N.L.] were both glad to see [M]other and went up and gave her big hugs. At first, neither [C.L.] nor [I.L.L.] seemed eager to play with the other. Everyone was content to do their own thing. Mother would generally just watch and occasionally talk to the children about what they were doing. It seemed to be very difficult for her to initiate activity. At Dr. Rosenblum's request, [M]other began to do some reading with the [C]hildren. He suggested a book that would entertain the [C]hildren called "An Elmo Look and Find Book." Mother did help [N.L.] to find some of the hidden pictures, but she was not particularly enthusiastic and did not give [N.L.] any praise. Mother did not try to do any reading with the boys. When Dr. Rosenblum handed [M]other a book called "No David," which "[I.L.L.] likes and is familiar with, [M]other talked him into building a garage out of Duplo blocks instead. For some reason she did not seem to want to read with [I.L.L.]. Early in the session [C.L.] asked when he was going to leave. Mother bypassed his question by telling him he just got here.

c. Mother was not particularly effective in settling conflicts between the boys. She also did not join them in their play at all. Mother suggested that the trucks needed a garage and she began to build one with Duplo blocks. She did not ask the boys to join her and she did not initiate any activities with them. …

d. Mother remained very flat and lacking in enthusiasm with the [C]hildren. She did not display any affection other than on one occasion coming out of the blue and saying, "aren't they beautiful," referring to the [C]hildren. Towards the end of the session [N.L.] came over and started helping [M]other build the garage.

e. Several times during the session [I.L.L.] left the room to check in with his foster mother. He seems to be very emotionally dependent on her. He asked if she could come in more than once. [I.L.L.] also expressed worry about his foster brother, [M.], and went out to foster mother to ask about him.

f. Mother did not make an effort to provide the [C]hildren with structure or identify things for them to do. She remained very passive and content to allow the [C]hildren to do their own thing with only a few exceptions. At the end of the evaluation session [M]other did ask the [C]hildren to help her clean up.

g. Mother lacks appropriate parenting skills.

h. Mother remains depressed, lethargic and inactive in her relationship with her [C]hildren. She is not able to provide them with the structure, stimulation, emotional support or attention that they need to progress in their development.

i. Mother has been evicted from homes in the past and is inadequate when it comes to making decisions or leading an independent lifestyle. Her interaction with the [C]hildren was very limited, with her being very passive in her parenting skills.

j. While the [C]hildren love their [M]other, she has become a peripheral figure in their lives. Accordingly, the relationship is not so necessary and sufficient to maintain that ending it would cause the [C]hildren to experience adverse emotional consequences or significant trauma.

. . .

n. [C.L.] and [N.L.] are in an excellent placement with [J.D.] and [S.D.]. The [D.'s] are young, energetic parents who are both teachers. They have been very active in helping [C.L.] adjust to their home. They are able to provide [C.L.] with a lot of consistency, needed structure as well as acceptance and

sustained emotional support. They are very comfortable in dealing with the efforts of [C.L.] and [N.L.] in testing limits. They are proud of the accomplishments that [N.L.] has sustained and are very optimistic that [C.L.] will continue to make progress as well. This is an outstanding placement for [C.L.] and [N.L.] with the foster parents being more than capable of providing the [C]hildren with a stable and secure home at this time and into the future.

o. [I.L.L.] remains a far more challenging, developmentally impaired youngster than his two younger siblings. [I.L.L.] has been diagnosed with pervasive developmental disorder. He is very awkward in his social emotional development, with limited social skills and inconsistency in his willingness or ability to interact effectively with other people. His foster mother, [T.I.], has a good deal of experience in working with special needs children. She has the skills to provide [I.L.L.] with needed structure as well as consistent discipline and support. She is committed to [I.L.L.] and desires providing him with a supportive home environment at this time and into the future.

*Id.* at 19 a-j and n-o.

Based upon the evidence presented, the court determined that CYF had carried its burden of proof and, thus, ordered the termination of Mother's parental rights. The court noted Mother's love for the Children, but also recognized that Mother had not made significant enough progress to safely care for the Children, especially in light of the Children's special needs. Lastly, the court concluded that "[t]he [C]hildren finally have the stability and safety that they deserve" and that "removal from these enriched environments would be detrimental to the safety and welfare of the [C]hildren." *Id.* at ¶ 32.

Mother filed a timely notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). She now raises the following issue for our review:

Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the [C]hildren pursuant to 23 Pa.C.S. § 2511(b)?

Mother's brief at 9.

Our standard of review regarding orders terminating parental rights is as follows:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005). In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *Id.* at 806. We have previously stated:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003). Additionally, this Court "need only agree with [the trial court's] decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

The termination of parental rights is controlled by 23 Pa.C.S.A. § 2511. Under this statute, the trial court must engage in a bifurcated process in which it initially focuses on the conduct of the parent under Section 2511(a). *See In the Interest of B.C.*, 36 A.3d 601 (Pa. Super. 2012). If the trial court determines that the parent's conduct warrants termination under Section 2511(a), it must then engage in an analysis of the best interests of the child under Section 2511(b). *See id.*

In the instant case, Mother does not challenge the trial court's analysis as it relates to her conduct under Section 2511(a); but rather, she limits her argument to the trial court's analysis of the best interests of Children under Section 2511(b).

Section § 2511(b) provides:

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

Pursuant to Section 2511(b), the trial court must take into account whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000) (*en banc*).

> In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." In addition, we instructed that the orphans' court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa.Super. 2008).

> While a parent's emotional bond with his or her child is a major aspect of the Subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial

- 9 -

relationship." As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010):

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted).

Mother argues that she loves the Children and that they love her, as evidenced by the fact that at visitations they run up to her and hug her. Mother indicates that "[s]imply because [she] may be unable to independently parent these children does not mean that she cannot provide them with a valued and beneficial relationship." Mother's brief at 16. She contends that with a termination of her parental rights, the Children "are doomed to have forever lost this valuable love and affection." *Id.* at 18.

Here, the court found that the termination of Mother's parental rights would best serve the needs and welfare of the Children. T.C.O. at 3. The court relied on the testimony and reports from Dr. Rosenblum, who indicated that it would be in the Children's best interests, despite their love for their Mother, to change the permanency goal to adoption. Specifically, in his report, authored after evaluations were conducted in February of 2014, Dr. Rosenblum stated that "[w]hile the children love their mother she has become a peripheral figure in their lives. As such I do not believe that their

- 10 -

relationship is so necessary and sufficient to maintain that ending it would cause the children to experience adverse emotional consequences or significant trauma." Dr. Rosenblum's Report (CYF's Exhibit 1), at 9.

In response to Mother's argument on appeal, we note that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition. *See In re K.K.R.-S.*, 958 A.2d 535 (Pa. Super. 2008). Accordingly, based upon our review of the record, we conclude that the court did not abuse its discretion in terminating Mother's parental rights to the Children pursuant to section 2511(b). Thus, we affirm the court orders terminating her parental rights.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/5/2014